IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID CLEMENCE,

                              Plaintiff,

        v.                                                                    OPINION and ORDER

COUNTY OF ONEIDA,                                                        20-cv-974-jdp
ONEIDA COUNTY SHERIFF'S OFFICE,
MICHAEL BARAN, TIMOTHY JOHNSON, and
GRADY HARTMAN,

                              Defendants.

---

Pro se plaintiff David Clemence alleges that Oneida County sheriff's deputies used excessive force to arrest him and that the sheriff's office fails to adequately train officers on use of force. Both sides move for summary judgment. Dkt. 22; Dkt. 48. The undisputed facts show that the deputies' use of force was reasonable under the circumstances. And Clemence has not provided any evidence that his injuries were caused by inadequate training or a county policy. I will grant defendants' motion and deny Clemence's, and the case will be dismissed.

FACTUAL BACKGROUND

A.  Clemence's summary judgment submissions

Pro se parties must comply with the court's rules and procedures. But pro se parties are not accustomed to the requirements of litigation, and they often face other challenges in meeting the court's formal requirements. Accordingly, I give will pro se parties some leeway, so long as they make a good faith effort to submit evidence to the court. Clemence's submissions remain deficient in several ways, despite the court's efforts to accommodate Clemence.

Clemence did not respond to defendants' motion for summary judgment or proposed findings of fact. Clemence filed his own motion for summary judgment, Dkt. 48, and a "request that [the] case be settled in [his] favor," Dkt. 50, but he didn't submit any evidence to support his motions. Clemence did file some documents with the court the day that his response to defendants' motion was due, but he didn't explain what they were or how they are related to the case. Dkt. 55.

Clemence later asked for an extension of time to respond to "defendant[s'] motions." Dkt. 65. Clemence didn't identify which motions he wished to respond to, but I inferred that he was referring to defendants' summary judgment motion. Dkt. 67. I gave Clemence two weeks to submit his response. Shortly before his response was due, Clemence informed the court that he was in the care of a psychiatric hospital and would not meet his deadline. I gave Clemence an additional three weeks to either submit his response to defendants' motion for summary judgment or give the court a status update. I told Clemence that if he didn't respond by his deadline, I might rule on defendants' motion for summary judgment without his submission or dismiss his case on appropriate terms. Dkt. 68.

A few days later, the court received two letters from Clemence. In the first, Clemence said that he was "unaware of any motion to compel by the defense" and that he would be released from the hospital within a week. Dkt. 70. The second letter is difficult to read, but it appears to describe the circumstances of his recent commitment and isn't related to the events in this lawsuit. Dkt. 71. He included some documents with this letter that also appear to be related to his recent health issues. Dkt. 71-1. The court has received nothing further from Clemence.

I conclude that it is appropriate to rule on the summary judgment motions at this time. Clemence had several opportunities to submit a substantive response to defendants' summary judgment motion, and his most recent submissions suggest that he does not intend to file one. Because Clemence did not respond to defendants' proposed findings of fact or provide his own, I will accept defendants' evidence as undisputed. *House v. Derouin,* No. 19-cv-1061-jdp, 2020 WL 6384197, at *1 (W.D. Wis. Oct. 30, 2020). But defendants still have the burden to show that summary judgment is appropriate. *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) ("even where many or all of the material facts are undisputed, the court still must ascertain that judgment is proper").

## B. Undisputed facts

The court draws the following from defendants' proposed findings of fact, Dkt. 31, as well as dashboard camera footage of the arrest from defendant deputy Michael Baran's squad car.[1] The video shows Clemence's physical altercation with the officers, so the court will draw from the footage to describe that portion of the incident.

On a summer evening in 2018, Oneida County dispatch received a 911 call from a civilian reporting that he was following an SUV heading northbound on Highway 17 that was driving erratically. The caller gave dispatch the license plate number of the vehicle.

Defendant deputies Michael Baran and Timothy Johnson were dispatched to investigate the call. Dispatch told the deputies that the vehicle belonged to David Clemence. Dispatch also told the deputies that there was an "officer safety" notation in Clemence's record that indicated that Clemence always carried a firearm in his vehicle. These kinds of notations

---

[1] The video does not have its own docket entry, but defendants submitted a copy of the video on a thumb drive when they filed their summary judgment motion. *See* Dkt. 26, ¶ 6.

are made only when a person had a prior interaction with law enforcement involving a handgun or weapon.

Baran and Johnson set out in separate squad cars, and they soon caught up to Clemence's vehicle. Clemence was traveling around 31 miles per hour in a 55 mile per hour zone and crossed the center line. Baran activated his sirens and lights. After Clemence pulled over, Baran saw Clemence reaching towards the center console and glove box.

Baran told Johnson that he thought it may be unsafe to approach Clemence's car. Johnson said that he would flank Clemence's car from the right-hand side while Baran issued commands from his squad vehicle. Johnson exited his car and approached the right side of Clemence's vehicle on foot. As Johnson approached, he also saw Clemence reach toward his center console.

Baran exited his car and stood behind his car's driver-side door. He yelled at Clemence to put both of his hands outside the window of his car three times, but Clemence did not respond. It was raining heavily, so Baran repeated his command through the car's PA system. Baran told Clemence to show his hands several more times, but Clemence still did not respond.

After a few minutes had passed, Clemence began opening his car's driver's side door and pushed it open with his foot. *See* dashboard camera footage at 13:50–14:04. Clemence exited the vehicle and walked a short distance towards Baran. *Id.* at 14:08–14:13. Baran yelled for Clemence to "stay right there." Clemence turned away from Baran and made a dismissive waving motion with his arm. *Id.* at 14:13. Clemence closed his car door and then turned back to face Baran. Baran yelled for Clemence to get on the ground, but Clemence remained standing with his hands at his side. Baran and Johnson approached Clemence with their guns drawn. As

the officers got nearer, Clemence made another gesture waving Baran off and turned to face his vehicle. *Id.* at 14:30.

When the officers were within a few feet of Clemence, they holstered their guns. Clemence suddenly turned his body and pressed his back against his car door. The officers tried to grab Clemence but struggled to gain control over him. *Id.* at. 14:36. The deputies managed to spin Clemence around to face his car, *id.* at 14:38. Johnson was able to gain control over Clemence's left arm, but Clemence didn't submit his right arm to Baran. *See id.* at 14:38–39. The officers testified that they yelled at Clemence to stop resisting, *see* Dkt. 29-2 (Baran Dep. 37:23–38:4), although that can't be heard on the video. When Clemence continued to resist, the officers decided to use a "decentralizing tactic" to subdue Clemence. Dkt. 31, ¶ 94. The officers lowered Clemence to his knees and then to the ground over the course of about three seconds. *See* dashboard camera footage at 14:39–43. Clemence pinned his right arm between his body and the ground, and Baran struggled to pull Clemence's right arm from underneath him. *Id.* at 14:43–15:08. Baran eventually gained control of Clemence's arm and Johnson placed him in handcuffs.

Clemence told the officers that he had bad knees and hips. The officers spoke to Clemence to determine the best way to help him up. After speaking with Clemence for about two minutes, the officers helped Clemence up and walked him back to Baran's squad car. Clemence asked for medical attention, so the officers called an ambulance. When the ambulance arrived, Baran told Clemence that he would remove the handcuffs if Clemence remained calm and cooperative. Clemence became combative and started making threats toward the deputies, so the deputies kept the handcuffs on.

Baran accompanied Clemence in the ambulance to the hospital. Baran left after Clemence was admitted.

ANALYSIS

To survive defendants' motion for summary judgment, Clemence must come forward with admissible evidence to support every element on which he bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the material facts are undisputed, the constitutionality of an officer's conduct is a question of law for the court to decide. *See Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

**A.  Excessive force**

Clemence contends that the deputies' use of force violated his rights under the due process clauses of the Fifth and Fourteenth Amendments.  Dkt. 1, ¶¶ 24-30. As defendants note, excessive force claims can be brought only under the Fourth Amendment, not the Fifth or Fourteenth. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Jewell v. Anders*, 521 F.3d 818, 827 n.9 (7th Cir. 2008). But plaintiffs aren't required to plead legal theories, so that isn't a significant defect in Clemence's case. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). The court will consider Clemence's claim under the proper Fourth Amendment standard.

Whether force was unconstitutionally excessive turns on "whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397 (1989) (internal quotations omitted). To determine whether the force used to make an arrest was reasonable, the court must consider (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir.

2009) (citing *Graham*, 490 U.S. at 397). Courts give considerable leeway to officers' assessments about the appropriate use of force in dangerous situations. *Id.*

The force the officers used to arrest Clemence was reasonable under the circumstances. The driving infractions that led to Clemence's arrest were not severe. But the other two factors weigh heavily in favor of the officers. First, the officers had reason to believe that Clemence was armed. The deputies knew that there was an "officer safety" notation in Clemence's record that Clemence always traveled with a firearm in his vehicle. After Clemence pulled over, the officers saw Clemence reach towards his center console and glove box, which could have held a gun. Clemence did not respond to Baran's command to place his hands outside the window and did not show his hands after stepping out of the car. Under those circumstances, it was reasonable for the officers to approach Clemence with their weapons drawn. *See Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008) (reasonable to point firearm at a suspect if officers believe he might be armed). And it was reasonable to physically restrain Clemence to ensure that he could not access any firearms on his person or in his vehicle.

Second, the force used to subdue Clemence was reasonable in light of Clemence's active resistance. Officers may use "significant force" to subdue someone who is actively resisting arrest. *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). Clemence refused to give the deputies his arms and struggled against their attempts to handcuff them. It can be reasonable for officers to use a takedown maneuver in the face of even mild resistance, *see Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019), so it was reasonable for the deputies to bring Clemence to the ground to subdue him. And the squad car video shows that the officers used controlled force to bring Clemence to his knees and then to the ground over the course of about three seconds. In other cases, the court of appeals has concluded that more severe

7

takedown methods were justified against suspects who presented less resistance than Clemence did here. *See Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (reasonable for officer to attempt a "knee strike" to buckle suspect's leg when he believed suspect was passively resisting); *Dawson v. Brown*, 803 F.3d 829, 834 (7th Cir. 2015) (reasonable to tackle 72-year-old to the ground when officer believed he intended to interfere with arrest of his son). The officers used no more force than was necessary to subdue Clemence, so their use of force was reasonable.

Clemence provides no evidence to dispute this conclusion. The only evidence that Clemence submitted is a list of injuries that he suffered prior to the events of his arrest, *see* Dkt. 55-1, a record of a doctor's visit from shortly after the arrest, Dkt. 55-3, and a copy of a "Driver Condition or Behavior Report" submitted to the Wisconsin Department of Motor Vehicles by defendant Baran that Clemence says contains false information, *see* Dkt. 55-5. None of these documents show that the officers used excessive force against him. Clemence doesn't explain how injuries he suffered *before* his arrest are relevant to his claims in this lawsuit. The doctor's note mentions that Clemence was experiencing knee pain after his arrest. But the note doesn't suggest that Clemence suffered serious or permanent injury; nor does it show that the officers used more force than was reasonably necessary to subdue Clemence in light of his resistance. And as for the DMV report, it says that Clemence was disoriented on the night of his arrest and seemed unsure of the roads and direction. Clemence says that as a result of the report, many of his driving privileges have been revoked. But he doesn't explain how the report shows that the officers used excessive force.

Clemence also says that the dashboard camera footage that defendants produced was falsified and created using actors, and he claims that the real footage shows that he wasn't

resisting arrest. *See* Dkt. 40. Clemence didn't submit admissible evidence to support his version of events, such as a sworn declaration. But even if Clemence's assertions were admissible, they wouldn't be enough to create a dispute of material fact or defeat summary judgment. Courts should not credit a party's version of events if it is contradicted by video evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The squad car video clearly shows that Clemence struggled against Baran and Johnson. And as I explained in a previous order denying Clemence's motion to compel production of the "real footage," Clemence has given me no reason to believe that the footage is fake. *See* Dkt. 67. Implausible claims must be supported "with more persuasive evidence to support [the] claim than would otherwise be necessary." *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 235 (7th Cir. 1995) (internal citations and quotation marks omitted). Here, Clemence has identified no evidence to support his implausible contention that defendants falsified the video. *See* Dkt. 67 (addressing Clemence's contention in more detail). Baran and Johnson are entitled to summary judgment on Clemence's excessive force claim.

**B. Supervisory and municipal liability**

Clemence asserts a supervisory liability claim against Oneida County Sheriff Grady Hartman and a municipal liability claim against Oneida County.[2] In his complaint, Clemence alleges that his injuries were the result of Hartman's failure to train the deputies and that there is an office-wide practice of using excessive force. Dkt. 1, ¶¶ 28, 38.

---

[2] Clemence also asserts a claim against the Oneida County Sheriff's Department, but sheriffs' offices aren't separate entities that can be sued separate from the county. *See Whiting v. Marathon Copunty Sheriff's Dept.*, 382 F.3d 700, 704 (7th Cir. 2004).

These claims fail at the outset because there is no underlying constitutional violation. "Neither [a county] nor the [] officers' supervisor can be held liable on a failure to train theory or on a municipal policy theory absent a finding that the individual [] officers are liable on the underlying substantive claim." *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997). I've already concluded that Johnson and Baran didn't violate the constitution, so there can be no claim against Hartman or the county.

But these claims would fail regardless, because Clemence hasn't identified any evidence to support them. To succeed on a failure to train claim against Hartman, Clemence needed to adduce evidence that Hartman knew that (1) the deputies were inadequately trained and (2) the inadequate training posed a substantial risk of serious harm. *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Clemence identifies no evidence that the office's training procedures are inadequate. To the contrary, the record shows that Hartman conducted a review of Baran and Johnson's training records and concluded that their training was up to date and compliant regarding use of force. And nothing in the record suggests that Hartman was aware of any problem in the training officers received. *See Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) (holding that supervisors must be aware of a substantial risk of harm to be liable).

To succeed on a claim against Oneida County, Clemence needed to submit evidence that his injuries were caused by an express county policy or a widespread practice so pervasive and customary that it has the force of policy. *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004). Clemence did not identify any inadequate use-of-force policies, and he submitted no evidence to suggest that there is a widespread policy or custom of using excessive force to make arrests. I will grant defendants' motion for summary judgment on Clemence's claims against Hartman and the county.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 22, is GRANTED.

2.  Plaintiff David Clemence's motion for summary judgment, Dkt. 48, is DENIED.

3.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered July 13, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge